Plaintiffs alleged they were the owners of Lot 15 of Block 101, McEnery part of the Lee Avenue Addition to the City of Monroe, Louisiana, together with a servitude or easement consisting of an 8-foot strip along, over and across a strip eight feet wide along the southern boundary of Lot 16 of Block 101 of the same Addition to be used as a driveway and means of ingress and egress. Lot 15 above described lies south of and adjacent to Lot 16 and Lot 16 is owned by the defendant herein.
The 8-foot strip above referred to lies between the residences of plaintiffs and defendant and has for many years been used by the owners of each lot as a driveway leading to the respective garages located on the two lots. When it nears the garage, the driveway forks, one prong leading to the garage situated on Lot 15 and the other prong to the garage on Lot 16. The garage of the defendant on Lot 16 is across the 8-foot strip and was so located long before the servitude was granted plaintiffs.
Plaintiffs contend in this suit that the defendant's garage, being located as it is, is an encroachment upon the 8-foot strip upon which they own a servitude. They also contend that defendant has built up the driveway and the rear of his lot and the 8-foot strip at his garage so as to cause them damage from standing water after each rain. They also complain that they cannot turn their car around because of the driveway being built up and because defendant's garage deprives them of the back fifty feet of the servitude they own on the 8-foot strip and therefore they are forced to back out from their garage.
Plaintiffs prayed for an injunction restraining the defendant from raising the driveway by adding gravel and dirt to it, also prayed that defendant be ordered to remove all the surplus dirt, sand, gravel, etc., which he has placed on the rear fifty feet of this servitude and to lower it to its former grade level. They further prayed that defendant be ordered to remove his garage.
Defendant denies that he is interfering in any manner with plaintiffs' use of the servitude acquired by them over the eight feet of his property and in reconvention alleged that the eaves of plaintiffs' garage project and extend approximately one foot over and onto the property owned by him. He prayed for a mandatory injunction ordering plaintiffs to remove said overhanging eaves. He further alleged that plaintiffs had placed stones and rocks over and onto his property and prayed for a mandatory injunction ordering the stones and rocks so placed by plaintiffs removed.
The lower court rendered judgment rejecting plaintiffs' demands and gave judgment in reconvention to defendant ordering the eaves of plaintiffs' garage removed from over defendant's property and the stones and rocks removed from defendant's property as prayed for by him. It gave the following written reasons for judgment:
"The Court has listened to the various witnesses who have testified in this case and, having heard these witnesses for the first time in their various statements, not being personally acquainted with the parties, is forcibly struck by the facts, as shown throughout the testimony, that this is a case where neighbors have fallen out and that a great deal of feeling exists in this matter.
"There are several points at issue in this case. First, the question of the 8-foot driveway, referred to in the testimony as an easement. That is the point before the Court as to just what right each party has in the 8-foot strip and what encroachment has been made thereon and what is the present legal situation thereto as affecting the owners of both lots. Another question raised in this case is the question of drainage. And the third question, going with the question of drainage, is the question of drip of rainfall from the various roofs.
"The two lots in question are set out in detail in the plats filed by both plaintiffs and defendant, the plat filed by the defendant giving the various elevations of the properties.
"The Court is informed from this evidence, as well as from the testimony of the witnesses, that these lots both front on Lover's Lane, and that they are a portion of Lot 15 and Lot 16 of Square 101 of McEnery's part of Lee Avenue Addition to Monroe, Louisiana.
"Lover's Lane is that street in the southern part of Monroe which runs north and south from South Grand Street approximately along the east bank of the Ouachita River, until the southern City limits of Monroe are reached. The street immediately *Page 33 
east of Lover's lane and the street back of the lots in question is Richmond Street. Richmond Street runs approximately north and south at that point.
"The Court states these facts at this time for this reason:
"That it is a known fact in Louisiana, which the Court can take judicial cognizance of in the absence of special proof to the contrary, that in Louisiana, as a rule, the high point of lands in given localities is the river bank and that the land slopes away or falls as it extends back from the bank of the river. This is due to the actual character of the Louisiana soil, practically all of which east of the Ouachita River in North Louisiana, especially a great part thereof, has been built up by overflows of the various rivers and streams. Thus, in the absence of any special proof, it would be natural to suppose that these two lots in question would drain from west to east, as they are situated very near the east bank of the Ouachita River, and, as a general rule, all drainage is from south to north or north to south, to follow the general principle, then the drainage would be down the River or in a southern direction. However, there is some very specific testimony offered in this case by Mr. Volk and other witnesses. Mr. Volk, the surveyor, says that he took the levels which existed under the south side of the house on Lot 16 and under the northeast corner of the house on Lot 15, occupied by Mrs. Campbell; these two points selected, as shown by his map, being approximately on a line north and south, and that the readings were as follows, as shown on the map and as testified to by Mr. Volk:
"Under the residence on Lot 16 elevation 100.03; under the Campbell residence, at the point designated, elevation 99.48. Thus we would have two readings, which would not be affected by the dirt piled in both yards, as testified to by the various witnesses, and these readings would bear out the general supposition that in that locality the drainage would be down the river or from north to south. However, there is not very much difference in the elevation of the two lots and there is no testimony in the record to show where the original natural drainage was, for the reason that all of the witnesses testified that when they first moved on these lots there was an 8-foot driveway and the runways therefrom constructed to the Campbell garage were in existence and at that time graveled but not to the depth which they are at present. The testimony, the Court thinks, clearly shows that the natural drainage of this property would be to the east.
"To return to the 8-foot driveway — Mrs. Campbell, who refers to this as an easement, when asked by the Court relative to the question of putting a drainage ditch along the boundary between the 8-foot driveway and her northern line, stated that she thought the drainage ditch should be in the middle of the 8-foot strip as she had as much right to the ownership of the strip as the defendant. The Court finds that not only is there a great deal of feeling existing between the litigants but they are under a misapprehension as to their rights. Mrs. Campbell, when she purchased the lot in question from Henry Branch, her son-in-law, could acquire only the right which Henry Branch had acquired from the Monroe Building Loan Association in the sale from the Building Loan to Branch under date of January 20, 1937.
"Prior to the sale by the Monroe Building Loan Association and at a time that they owned both lots, they had sold Lot 16 on July 23, 1935, to the defendant, Wm. E. Bennett. Bennett's testimony is to the effect that he was living in the house on Lot 16 at the time he bought it; that the garage on Lot 16, which is constructed along the eastern end of the 8-foot strip, was on the property when he bought it from the Monroe Building Loan and was on there when he was renting from the Monroe Building Loan. In selling Lot 16 to Bennett, which was the first sale the Building Loan made, and at the time the Building Loan owned Lot 15, the Monroe Building Loan sold Lot 16 outright to the defendant, Bennett. However, the deed recites that the sale is made subject to a servitude in favor of Lot 15 of Block 101 of McEnery's part of Lee Avenue Addition, along, over and across a strip eight feet wide along the southern boundary of Lot 16 of Block 101 to be used as a driveway and means of ingress and egress. Two points arise here: One, that the servitude flows in favor of Lot 15 of Block 101, and the testimony shows that this plaintiff owns part of Lot 15, and the Court presumes someone else owns the remaining part of Lot 15. The servitude flows in favor of the entire lot. However, the only thing that the servitude subjects Lot 16 to is what is recited in the deed from the Building and Loan to Bennett; that is, the 8-foot strip along the southern boundary line *Page 34 
of Lot 16 is subject to the servitude in favor of Lot 15 for the purpose of being used as a driveway and means of egress and ingress. The servitude existed for those purposes only.
"Returning to the maps which were filed in evidence, we find that these two lots in question front on Lover's lane and that to the rear or east of them and between them and Richmond Street are lots 7 and 8. There is no alley between Lots 7 and 16 or Lot 8 and Lot 15, which would extend to any of them. In other words, the only way a person could get to a public street from the rear of Lot 15 without trespassing on other lots, would be to go down the 8-foot driveway to Lover's Lane. All that was transferred to the plaintiff and her authors in title by the Building Loan was this servitude, which was reserved on the property which the Building Loan formerly sold to Bennett, and that is the right to use this property as a driveway as a means of ingress and egress. Clearly, the Building Loan meant ingress and egress to Lover's Lane, as that is the only public street which either lot touched and the only way in which it was to be used as a means of ingress and egress.
"Furthermore, the garage in question, where it was built, was clearly considered by the Building Loan and all parties concerned at that time, that is, at the time of the sale to Bennett, not to affect the servitude in question, as this servitude could only be used in a westerly direction in going to Lover's Lane. No other rights, except the right of ingress and egress and the use of this property as a driveway, are conferred by this servitude.
"In other words, this servitude confers no private right whatever. Furthermore, it confers no ownership right whatever but merely the right of passage in and out. The ownership of the 8-foot strip is clearly in the owner of Lot 16 and he has full authority over same, subject to the servitude in favor of the owners of Lot 15, as a means of ingress and egress from Lot 15.
"Furthermore, after the sale to Branch, the Monroe Building 
Loan Association, William E. Bennett and Henry Branch, who was the party from whom the present claimant purchased the property, signed a document on April 9, 1937, which is filed in evidence by plaintiffs. This document sets forth that Branch and the Building Loan specifically declare that the servitude shall never be exerted by them, their heirs, successors or assigns to force or compel Bennett or any future owner of the property to move or tear down any portion of the Bennett house, as it is now located, by virtue of this servitude. It is further recited, — `this is done to clarify the servitude as written at the time of your acquisition, inasmuch as this letter expresses the true understanding and agreement at the time that the servitude was imposed upon your lot.'
"This was done for the reason, as shown by the plat filed in evidence and as testified by the witnesses, when it was discovered by the witnesses that part of the house sold by the Building Loan protruded into the 8-foot strip on which the servitude was obtained. It is noted that no contest was raised at that time as to the garage and it was noted from the careful writing of this document, which is marked `partial release of servitude', that clearly what they meant by expressing the real intent was that they had a right of egress and ingress over the 8-foot strip and not that any building covering part of same, at the time of the sale to Bennett, should be torn down or disturbed. No other meaning can be placed upon this document.
"As stated, it is the Court's conclusion that the owners of Lot 15 have a right to use the 8-foot strip in question as a driveway as a means of ingress and egress, but their rights stop there.
"The Court further finds from the map that the garage on Lot 15 is constructed too close to the line that it extends, that is, the eaves extend .85 of a foot across the northern boundary line of Lot 15.
"The Court fails to find that either lot is entitled to drain its water across the other lot, there being no testimony that either lot was ever subject to a natural drainage from the other lot. Therefore it is incumbent upon the owners of the respective lots to see to it that the water from their various lots do not drain across the line in question. The most simple solution to the whole problem, as the Court sees it, would have been to put a drainage ditch and tile along the boundary line between the two lots, which would most probably have solved the drainage problem of both lots.
"The owner of Lot 16 certainly would have a right to improve the driveway but he can do nothing which would affect the servitude or right of the owner of Lot 15 to use same. *Page 35 
"The plaintiffs pray for an injunction to restrain and enjoin the defendant from raising the driveway, which is the servitude as set out in the above petition, in such ways as therein set out as causes your petitioners the loss of the use of said servitude and further pray that the defendant be enjoined from interfering with petitioners' free and easy use of the servitude by continuing to raise it and in operating and using the garage in the rear 16 1/2 feet. Plaintiffs also pray that the defendant be commanded to remove all of the surplus dirt, sand, gravel, etc., which he has placed on the rear fifty feet of this servitude or easement and lower it to its former grade level, as when the Lot was purchased and the servitude was placed thereon by contract with the Monroe Building Loan Association, of Monroe, Louisiana, co-authors of the title of your petitioners' and defendant's lots. Further pray that the defendant be enjoined from using the garage and that he be ordered to remove the same from the servitude.
"The Court has listened carefully to the testimony as to the difference in elevation which now exists between the driveways on Lot 15, which is graveled, and the driveway on the 8-foot servitude, which is graveled. The plaintiffs have introduced a number of pictures in evidence showing these two driveways where they come together and the Court has carefully studied these pictures as well as the maps. The testimony of the plaintiffs and their witnesses is to the effect that the water stands on the rear of their lot at times when the driveway is not under water. This is mentioned for the reason that her testimony, along with other witnesses, that the graveled driveway on the lot is higher than portions of the lot not graveled. That fact is borne out by the water because water seeks its level.
"Referring again to the map, the Court notes that the level marked by Mr. Volk on the southeastern corner of Lot 15, that is plaintiffs' portion thereof, the elevation is 100.69; that the elevation at the southwestern corner of the plaintiffs' garage is 99.88; that the elevation at the northwest corner of plaintiffs' garage is 99.83; that the elevation taken every ten feet on the 8-foot driveway to be 99.80, 101.15, 100.37, and this is the point at which the two driveways come together; 100.36, which is another point in the intersection of the two driveways; 100.23, which is at the western extremity where the two driveways come together. So, clearly, from the elevations stated, we note only an inch or two difference between the two driveways if, in fact, the graveled driveway on Lot 15 is higher than the ungraveled portion of the said lot, as it would seem to be borne out, then the water did not stand on the same.
"Furthermore, the pictures introduced by the plaintiffs show for themselves and convince the Court that there is not much difference between the elevations of the two driveways. Certainly not such a difference as would affect the use of the 8-foot servitude.
"In view of what the Court has heretofore said relative to the relation of the servitude to the garage, which was on the property prior to the time the servitude was placed there, the Court finds there is no merit to the prayer of the plaintiffs for the garage to be removed, especially in view of the fact that the removal of the garage would in no way open up any additional methods of ingress and egress to Lot 15, as there is no alley or street to the rear of these lots.
"For the reasons above stated, the Court finds that the demands of the plaintiffs should be rejected at their cost.
"As to the reconventional demand, the Court finds that as a matter of proof from the evidence and matter of fact, the garage of plaintiffs does, in fact, extend over on the property of defendant; that is that the eaves of the garage extend across the northern boundary of plaintiffs' lot some .85 of a foot, but the Court knows of no law which would grant unto defendant the right to bring such an action in reconvention in an injunction suit and, for that reason, rejects the demands of defendant in reconvention."
A rehearing was granted by the lower court upon the application of both plaintiffs and defendant and then the judgment in reconvention was granted, as stated above. The reconventional demand was correctly allowed.
Plaintiffs converted what started out to be truly an injunction suit into an ordinary suit by alleging and praying that affirmative action be taken. They not only prayed for an injunction against defendant on several grounds but also prayed that defendant be commanded and ordered to remove all surplus dirt, sand and gravel and remove his garage. Furthermore, there was no objection by plaintiffs to the pleadings or the *Page 36 
admissibility of the evidence under the pleadings.
We have failed to find any error in the judgment of the lower court and it is affirmed, with costs.